## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

FENDI S.R.L.,

      Plaintiff,

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

      Defendants.

Civil Action No.: 1:24-cv-00907

## COMPLAINT

Plaintiff Fendi S.r.L. ("Fendi") hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

## JURISDICTION AND VENUE

1.    This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq*., 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, e-commerce stores operating under the Defendant aliases and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive internet stores through which Illinois residents

1

can purchase products bearing counterfeit versions of Plaintiff's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of Plaintiff's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## INTRODUCTION

3.      This action has been filed by Fendi to combat online counterfeiters who trade upon Fendi's reputation and goodwill by offering for sale and/or selling products in connection with Fendi's federally registered trademarks (the "Counterfeit Fendi Products"). Defendants create e-commerce stores operating under one or more Defendant Internet Stores that are advertising, offering for sale and selling Counterfeit Fendi Products to unknowing consumers. E-commerce stores operating under the Defendant Internet Stores share unique identifiers establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Defendant Internet Stores to conceal both their identities and the full scope and interworking of their counterfeiting operation. Fendi is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Fendi Products over the internet. Fendi has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and goodwill as well as the quality of goods bearing the Fendi Trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

## THE PLAINTIFF

4.      Fendi is organized and existing under the laws of Italy with its principal place of business in Italy.

5.      Fendi was founded in 1925 by Adele and Edoardo Fendi. Fendi is a world-famous luxury brand engaged in the business of styling and selling a diverse portfolio of high-quality luxury goods, including a variety of men's and women's apparel, fashion accessories, and leather goods sold throughout the United States (collectively, the "Fendi Products"). In 2000, Fendi became part of the Louis Vuitton Moet Hennessy (LVMH) group.

6.      Fendi Products have become enormously popular and even iconic, driven by Fendi's arduous quality standards and innovative designs. Among the purchasing public, genuine Fendi Products are instantly recognizable as such. In the United States and around the world, the Fendi brand has come to symbolize high quality, and Fendi Products are among the most recognizable of their kind in the world.

7.      Fendi Products are distributed and sold to customers through retailers throughout the United States, including in company-operated boutiques, via its e-commerce website located at www.fendi.com, and through a selective network of high-quality department stores in Illinois such as Nordstrom, Neiman Marcus, and Saks Fifth Avenue.

8.      Fendi incorporates a variety of distinctive marks in the design of its various Fendi Products. As a result of its long-standing use, Fendi owns common law trademark rights in its trademarks. Fendi has also registered its trademarks with the United States Patent and Trademark Office. Fendi Products typically include at least one of Fendi's registered trademarks. Often several Fendi marks are displayed on a single product. Fendi uses its trademarks in connection with the marketing of its Fendi Products, including the following

marks which are collectively referred to as the "Fendi Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,214,472 |  | Oct. 26, 1982 | For: Leather and Imitations of Leather; Luggage, Trunks, and Travelling Bags in class 018 |
| 1,244,466 | FENDI | July 05, 1983 | For: Traveling Luggage, Trunks, Purses, Rucksacks, Brief Cases, Attache Cases, Wallets, Key Cases, Passport Cases, Business Card Cases, Cosmetic Cases Sold Empty in class 018 For: Fur Coats, Fur Stoles, Fur Jackets, Raincoats, Cloth Coats, Jackets, Skirts, Blouses, Dresses, Hosiery, Shirts, Trousers, Hats, Scarves, Foulards, Gloves, Ties, Neckwear, Belts, Swimwear, Shoes, Boots in class 025 |
| 1,267,539 |  | February 21, 1984 | For: Perfumes, Toilet Water in class 003 For: Fur Coats, Fur Stoles, Fur Pieces, Rainwear, Cloth Coats, Jackets, Skirts, Trousers, Dresses, Hosiery, Shirts, Blouses, Headwear, Scarves, Foulards, Gloves, Ties, Neckwear, Belts, Swimwear, Shoes, Boots in class 025 |
| 2,648,256 |  | November 12, 2002 | For: Leather and imitation of leather items, namely, traveling trunks and traveling bags, attache cases, briefcases, handbags, shoulder bags, men's carry-on bags, tote bags, wallets, purses in class 018 |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 2,648,257 |  | November 12, 2002 | For: Leather and imitation of leather items, namely, handbags, shoulder bags in class 018 |
| 4,036,925 |  | October 11, 2011 | For: Leather and imitation leather; furs; goods made of leather and imitation leather, namely, handbags, shoulder bags, briefcases, leatherwear, namely, key cases, purses, wallets, backpacks, pouches, leather straps in class 018

For: Clothing, namely, shirts, t-shirts, sweatshirts, sport shirts, pants, sport pants, trousers, shorts, skirts, dresses, belts, sweaters, cardigans, pullovers, jackets, scarves, foulards, gloves; waterproof clothing, namely, waterproof jackets, swimsuits; hats; footwear, namely, shoes, sport shoes, boots, slippers, sneakers, sandals in class 025 |
| 4,362,861 |  | July 9. 2013 | For: Eyeglasses, sunglasses, eyeglass and sunglass lenses, eyeglass frames in class 009

For: Jewelry of precious and non-precious metal, namely, bracelets, necklaces, neck chains and rings, earrings, watches, wristwatches, watch bands and straps, chronographs for use as timepieces and for use as watches in class 014

For: Bags, namely, shoulder bags, travelling bags, handbags, Boston bags, waist packs, sling bags for carrying infants, leather and canvas shopping bags, duffle bags, tote bags, clutch bags, trunks, wallets, purses, briefcases, attach cases, pouches of leather or textile, school bags, suitcases, garment bags for travel, key cases made of leather, backpacks, rucksacks, vanity cases sold empty, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | carry-on bags, beach bags, umbrellas in class 018 |
| | | | For: Furniture, household furniture, namely, chairs, lounge chairs, armchairs, tables, coffee tables, stools, sofas and divans, ottomans in class 020 |
| | | | For: beach towels in class 024 |
| | | | For: Articles of clothing for men, women and children, namely, pullovers, cardigans, sweaters, jumpers, jackets, sweatshirts, parkas, blouses, shirts, trousers, jeans, waistcoats, skirts, T-shirts, dresses, men's suits, coats, overcoats, jackets, vests, shawls, scarves, neckties, gloves for clothing, belts for clothing, shoes, boots, sandals, slippers[,] hats and caps in class 025 |
| 4,409,049 | FENDI | October 1, 2013 | For: Perfumes, eau de parfum, toilet water, after shave creams, after shave lotions, shaving lotions, shampoos, creams, deodorants for personal use, toilet soaps, bath soaps, bath and shower gels, body lotions, skin lotions in class 003 |
| | | | For: Eyeglasses, sunglasses, eyeglass frames and eyeglass cases; bags, cases and sleeves specially adapted for holding or carrying all the above mentioned goods, namely, eyeglasses, sunglasses, eyeglass and sunglass lenses, eyeglass frames and eyeglass cases; telephones and mobile phones in class 009 |
| | | | For: Jewelry of precious and non-precious metal, namely, bracelets, necklaces, neck chains and rings, brooches, earrings, pendants, cuff-links, jewelry cases; clocks, watches, wristwatches, watch bands and straps, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | chronographs for use as timepieces and for use as watches, chronometers in class 014 |
| | | | For: Bags, namely, shoulder bags, travelling bags, handbags, Boston bags, waist packs, leather and canvas shopping bags, duffle bags, tote bags, clutch bags, trunks, wallets, purses, briefcases, attach cases, pouches of leather or textile, school bags, suitcases, key cases made of leather, backpacks, rucksacks, vanity cases sold empty, carry-on bags, beach bags, umbrellas in class 018 |
| | | | For: Furniture, bathroom furniture, kitchen furniture, household furniture, namely, chairs, lounge chairs, armchairs, tables, coffee tables, benches, stools, beds, bedside tables, wardrobes, desks, sofas and divans, ottomans, shelves, drawers, wall cupboards, showcases, television stands, bookshelves, bathroom cabinets; mirrors in class 020 |
| | | | For: Articles of clothing for men, women and children, namely, pullovers, cardigans, sweaters, jerseys, jumpers, jackets, sweatshirts, parkas, bathing suits, blouses, shirts, trousers, jeans, waistcoats, skirts, shorts, T-shirts, dresses, men's suits, coats, raincoats, overcoats, fur coats and jackets, vests, hosiery and panty hose, bathrobes, shawls, scarves, neckties, gloves for clothing, belts for clothing, shoes, boots, sandals, slippers, clogs, hats and caps in class 025 |
| | | | For: The bringing together, for the benefit of others, of a variety of goods excluding the transport thereof, such as eyeglasses, jewellery, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | horological instruments, bags, wallets and other leather goods, furniture, clothing, footwear, headgear, personal accessories, enabling customers to conveniently view and purchase those goods, as well as retail store services for the above mentioned products in class 035<br><br>For: Resort hotel services, namely, hotel services and hotel accommodation, hotel services for holidays, resort hotel services; providing temporary lodging services in the nature of a condominium and cooperative hotel; restaurant, bar and cocktail lounge services; contract food services; take away restaurant services; bars, restaurants and cafes; catering services; provision of exhibition facilities in the nature of halls; travel agency services, namely, making reservations and bookings for temporary accommodation in class 043 |
| 4,916,008 |  | March 15, 2016 | For: Eyeglasses; sunglasses; eyeglass frames; eyeglass and sunglass cases and holders; strings and chains for eyeglasses and sunglasses in class 009 |
| 4,929,737 | FENDI | April 5, 2016 | For: Eyeglasses; sunglasses; eyeglass lenses; eyeglass frames; eyeglass and sunglass cases and holders; protective helmets; sports helmets; helmets for motorcyclists; blank USB flash drives; headphones; earphones; hi-fi apparatus, namely, record players, audio speakers, personal stereos; cameras and digital cameras; video cameras; bags, cases and sleeves specially adapted for holding or carrying mobile phones, computers, laptop computers, headphones, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | earphones, photographic apparatus and equipment, cameras, and video cameras; and strings and chains, namely, straps and lanyards specially adapted for mobile phones, MP3 players, MP4 players, portable media players, and digital audio and video players in class 009 |
| 5,139,608 | FENDI | February 14, 2017 | For: Shoulder straps for handbags in class 018 |
| 5,505,551 |  | July 3, 2018 | For: Fragrances; make-up in class 003

For: Cell phone cases; cell phone covers; cell phone straps; sunglasses in class 009

For: Decorative fobs for keys; key rings with decorative trinkets or fobs; precious metal key holders with decorative trinkets or fobs; key holders of precious metals; key fobs of precious metals; key rings of precious metals; key fobs being rings coated with precious metal; key chains as jewelry, being trinkets or fobs; key rings with decorative trinkets or fobs of precious metal in class 014

For: Leather and imitations of leather; animal skins and hides; trunks and travelling bags; umbrellas and parasols; walking sticks; whips; harness; saddlery; all-purpose carrying bags; shoulder bags; travelling bags; hand bags; boston bags; waist packs; sling bags for carrying infants; duffle bags; tote bags; clutch bags; wallets; purses; briefcases; attaché cases; pouches of leather; pouches of textile, not for packaging; school bags; suitcases; garment bags for travel; key cases made of leather; backpacks; |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | rucksacks; vanity cases sold empty; carry-on bags; beach bags; umbrellas in class 018 |
| | | | For: Furniture; mirrors; picture frames; air cushions, not for medical purposes; air mattresses, not for medical purposes; air pillows, not for medical purposes; bead curtains for decoration; bedding, except linen, namely, beds, mattresses, pillows and bolsters; busts of wood, wax, plaster or plastic; wardrobes; curtain holders, not of textile material; curtain tie-backs, namely, non-textile curtain holders; cushions; doors for furniture; dressmakers' dummies; screens for fireplaces; house numbers, not of metal, non-luminous; indoor window blinds being shades; infant walkers; mannequins; decorative mobiles; pet cushions; pillows; slatted indoor blinds; statues of wood, wax, plaster or plastic; statuettes of wood, wax, plaster or plastic; table tops; tailors' dummies; decorative wind chimes; works of art of wood, wax, plaster or plastic; signboards of wood or plastics in class 020 |
| | | | For: Clothing, namely, shirts and pants; footwear; headwear; pullovers; cardigans; sweaters; jerseys; jumpers; jackets; sweatshirts; parkas; bathing suits; blouses; shirts; trousers; jeans; waistcoats; skirts; shorts; T-shirts; dresses; men's suits; coats; raincoats; overcoats; fur coats and jackets; overalls; underwear; vests; hosiery; panty hose; bathrobes; shawls; scarves; neckties; gloves being clothing; belts for clothing; shoes; boots; sandals; slippers; clogs; hats and caps in class 025 |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | For: Information and advice in relation to retail store services in the field of ready-to-wear, clothing and footwear; information and advice in relation to direct selling through telecommunications in the field of ready-to-wear, clothing and footwear; information and advice in relation to direct selling through telephone in the field of ready-to-wear, clothing and footwear; information and advice in relation to direct selling through facsimile in the field of ready-to-wear, clothing and footwear; information and advice in relation to direct selling through email in the field of ready-to-wear, clothing and footwear; information and advice in relation to direct selling through the Internet in the field of ready-to-wear, clothing and footwear; information and advice in relation to on-line direct selling in the field of ready-to-wear, clothing and footwear; information and advice in relation to wholesale store services in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through telephones in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through facsimiles in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through email in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through the Internet including social networks in the field of ready-to-wear, clothing and footwear; organisation of mail order promotions in the field of ready-to-wear, clothing and footwear; marketing, including direct marketing |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | and direct mail advertising in the field of ready-to-wear, clothing and footwear; advertising by mail order in the field of ready-to-wear, clothing and footwear; point of purchase promotions in the field of ready-to-wear, clothing and footwear; on-line advertising in the field of ready-to-wear, clothing and footwear; sale promotions in the field of ready-to-wear, clothing and footwear in class 035 |
| 5,563,158 |  | September 18, 2018 | For: Fragrances; make-up in class 003<br><br>For: Cell phone cases; cell phone covers; cell phone straps; sunglasses in class 009<br><br>For: Decorative fobs for keys; key rings being trinkets or fobs; key holders of precious metals being trinkets or fobs; key holders of precious metals; decorative key fobs of precious metals; key rings of precious metals; key fobs being rings coated with precious metal; key chains as jewelry, being trinkets or fobs; key rings being trinkets or fobs of precious metal in class 014<br><br>For: Leather and imitations of leather; animal skins and hides; trunks and travelling bags; umbrellas and parasols; walking sticks; whips; harnesses; saddlery; bags, namely, leather bags, weekend bags and all-purpose carrying bags; shoulder bags; travelling bags; hand bags; boston bags; waist packs; sling bags for carrying infants; duffle bags; tote bags; clutch bags; wallets; purses; briefcases; attaché cases; pouches of leather; pouches of textile, not for packaging; school bags; suitcases; |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | garment bags for travel; key cases made of leather; backpacks; rucksacks; vanity cases sold empty; carry-on bags; beach bags; umbrellas in class 018 |
| | | | For: Furniture; mirrors; picture frames; air cushions, not for medical purposes; air mattresses, not for medical purposes; air pillows, not for medical purposes; bead curtains for decoration; bedding, namely, beds, bed headboards and bed fittings not of metal; busts of wood, wax, plaster or plastic; covers for clothing being wardrobe; curtain holders, not of textile material; curtain tie-backs in the nature of non-textile curtain holders; cushions; doors for furniture; dressmakers' dummies; fire screens, domestic being screens for fireplaces; garment covers for storage being nonmetal and non-paper containers for storage, fitted fabric furniture covers, furniture and wardrobes; house numbers, not of metal, nonluminous; indoor window blinds being shades; infant walkers; mannequins; decorative mobiles; pet cushions; pillows; slatted indoor blinds; statues of wood, wax, plaster or plastic; statuettes of wood, wax, plaster or plastic; table tops; tailors' dummies; decorative wind chimes; works of art of wood, wax, plaster or plastic; signboards of wood or plastics in class 020 |
| | | | For: Clothing, namely, shirts, dresses, pants and sweaters; footwear; headwear; pullovers; cardigans; sweaters; jerseys; jumpers; jackets; sweatshirts; parkas; bathing suits; blouses; shirts; trousers; jeans; waistcoats; skirts; shorts; T-shirts; |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
| --- | --- | --- | --- |
| | | | dresses; men's suits; coats; raincoats; overcoats; fur coats and jackets; overalls; underwear; vests; hosiery; panty hose; bathrobes; shawls; scarves; neckties; gloves being clothing; belts for clothing; shoes; boots; sandals; slippers; clogs; hats and caps being headwear in class 025 |
| | | | For: Providing information and advice in relation to retailing services in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to direct selling through telecommunications in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to direct selling through telephone in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to direct selling through facsimile in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to direct selling through email in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to direct selling through the Internet in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to on-line direct selling in the field of ready-to-wear, clothing and footwear; providing information and advice in relation to wholesaling services in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through telephones in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through facsimiles in the field of ready-to-wear, clothing |

14

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | and footwear; computerized on-line ordering service through email in the field of ready-to-wear, clothing and footwear; computerized on-line ordering service through the Internet including social networks in the field of ready-to-wear, clothing and footwear; advertising by mail order, namely, organisation of mail order promotions in the field of ready-to-wear, clothing and footwear; marketing, including direct marketing and direct mail advertising in the field of ready-to-wear, clothing and footwear; advertising by mail order in the field of ready-to-wear, clothing and footwear; promotion and marketing services, namely, point of purchase promotions in the field of ready-to-wear, clothing and footwear; on-line advertising in the field of ready-to-wear, clothing and footwear; sales promotions services in the field of ready-to-wear, clothing and footwear in class 035 |
| 6,821,740 |  | August 16, 2022 | For: Fragrances; perfumery in class 003<br><br>For: Carpets in class 027 |
| 6,874,501 |  | October 18, 2022 | For: Sunglasses in class 009<br><br>For: Necklace, rings, earrings, bracelet in class 014 |

9.     The Fendi Trademarks have been used exclusively and continuously in the

United States by Fendi and have never been abandoned. The above U.S. registrations for the Fendi Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 1** are true and correct copies of the U.S. Registration Certificates for the Fendi Trademarks included in the above table. The registrations for the Fendi Trademarks constitute *prima facie* evidence of their validity and of Fendi's exclusive right to use the Fendi Trademarks pursuant to 15 U.S.C. § 1057(b).

10.     The Fendi Trademarks are exclusive to Fendi and are displayed extensively on Fendi Products and in Fendi's marketing and promotional materials. Fendi Products have long been among the most famous and popular of their kind in the world and have been extensively promoted and advertised at great expense. In fact, Fendi has expended millions of dollars annually in advertising, promoting, and marketing goods featuring the Fendi Trademarks. Because of these and other factors, the Fendi name and the Fendi Trademarks have become famous throughout the United States.

11.     The Fendi Trademarks are distinctive when applied to the Fendi Products, signifying to the purchaser that the products come from Fendi and are manufactured to Fendi's quality standards. Whether Fendi manufactures the products itself or licenses others to do so, Fendi has ensured that products bearing its trademarks are manufactured to the highest quality standards. The Fendi Trademarks have achieved tremendous fame and recognition, which has only added to the distinctiveness of the marks. As such, the goodwill associated with the Fendi Trademarks is of incalculable and inestimable value to Fendi.

12.     Fendi operates an e-commerce website where it promotes Fendi Products at Fendi.com. Fendi Products are featured and described on the website and are available for purchase. The Fendi.com website features proprietary content, images, and designs exclusive to

Fendi.

13.     Fendi has expended substantial time, money, and other resources in developing, advertising and otherwise promoting the Fendi Trademarks. As a result, products bearing the Fendi Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products from Fendi. Fendi is a multi-million-dollar operation, and Fendi Products have become among the most popular of their kind in the world. Products bearing the Fendi Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being sourced from Plaintiff.

**THE DEFENDANTS**

14.     Defendants are individuals and business entities who, upon information and belief reside and/or operate in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this judicial district, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit Fendi Products to consumers within the United States, including Illinois and in this judicial district.

**DEFENDANTS' UNLAWFUL CONDUCT**

15.     The success of the Fendi brand has resulted in its significant counterfeiting. Consequently, Fendi has a worldwide anti-counterfeiting program and regularly investigates suspicious e-commerce stores identified in proactive internet sweeps and reported by consumers. In recent years, Fendi has identified numerous fully interactive e-commerce stores, including those operating under the Defendant Internet Stores, which were targeting and/or offering for sale

Counterfeit Fendi Products to consumers in this judicial district and throughout the United States.

16.     In the past, Fendi was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken. The company has availed itself of takedown procedures to remove infringing products, but these efforts have proved to be an unavailing game of whack-a-mole against the mass counterfeiting that is occurring over the internet. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed Plaintiff and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices substantially below an original:

<u>ORIGINAL</u>



<u>COUNTERFEIT</u>



17.     The above example evidences a cooperative counterfeiting network using fake eCommerce storefronts designed to appear to be selling authorized products. To be able to offer the counterfeit products at a price substantially below the cost of the original, while still being able to turn a profit after absorbing the costs of manufacturing, advertising, and shipping, requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.
>                                  . . .
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business**

**Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

. . .

Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, ([https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods](https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods)), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

18.    The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them, and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants also use templates with common design elements that omit information identifying Defendants. Defendants attempt to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.

. . .

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On

these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.

. . .

Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

19.     eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform. It formed a special task force that worked in conjunction with Chinese authorities for a boots-on-the-ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20                                    

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

*See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 3).**

20.     Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and goodwill as well as the quality of goods bearing the Fendi Trademarks. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.

…

The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and

then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2)** at 4, 8, 11.

21.     Not only are the creators and brand holders harmed, but the public is also harmed:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.

The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

22.     Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Internet Stores that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research

shows that there is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of Plaintiff's products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them, and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's registered trademarks, as well as to protect unknowing consumers from purchasing unauthorized Fendi products over the internet.

23.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Defendant Internet Stores, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold Counterfeit Fendi Products to residents of Illinois.

24.     Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Defendant Internet Stores appear sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Defendant Internet Stores often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Fendi has not licensed or authorized Defendants to use any of the Fendi Trademarks, and none of the Defendants are authorized

retailers of genuine Fendi Products.

25. Many Defendants also deceive unknowing consumers by using the Fendi Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores in order to attract various search engines crawling the internet looking for websites relevant to consumer searches for Fendi Products. Other e-commerce stores operating under Defendant Internet Stores omit using the Fendi Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Fendi Products.

26. On information and belief, Defendants have engaged in fraudulent conduct when registering the Defendant Internet Stores by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

27. On information and belief, Defendants regularly register or acquire new online internet stores for the purpose of offering for sale and selling Counterfeit Fendi Products. Such seller alias registration patterns are one of many common tactics used by the Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

28. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Defendant Internet Stores often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other aliases they operate or use. E-commerce stores operating under the Defendant Internet Stores include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords,

advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Fendi Products for sale by the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Fendi Products were manufactured by and come from a common source and that Defendants are interrelated.

29.    In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection report on seizure statistics indicated that e-commerce sales have contributed to large volumes of low-value packages imported into the United States. U.S. Customs and Border Protection, *Intellectual Property Right Seizure Statistics*, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf), attached hereto as **Exhibit** 4. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. A substantial amount of all intellectual property seizures occur in the international mail and express environments. Id. CBP made over 27,000 seizures with an estimated MSPR of over $3.3 billion, 152% increase over the previous Fiscal Year. *Id*.

30.     Counterfeiters such as Defendants typically operate under multiple online internet stores and payment accounts so that they can continue operation in spite of Fendi's enforcement efforts. On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court.

31.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Fendi Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff, have jointly and severally, knowingly and willfully used and continue to use the Fendi Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Fendi Products into the United States and Illinois over the internet.

32.     Defendants' unauthorized use of the Fendi Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Fendi Products, including the sale of Counterfeit Fendi Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Fendi.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

33.     Fendi hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

34.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Fendi Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of

infringing goods. The Fendi Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Fendi Products offered, sold, or marketed under the Fendi Trademarks.

35.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the Fendi Trademarks without Fendi's permission.

36.     Fendi is the exclusive owner of the Fendi Trademarks. Fendi's United States Registrations for the Fendi Trademarks (Exhibit 1) are in full force and effect. On information and belief, Defendants have knowledge of Fendi's rights in the Fendi Trademarks and are willfully infringing and intentionally using counterfeits of the Fendi Trademarks. Defendants' willful, intentional, and unauthorized use of the Fendi Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Fendi Products among the general public.

37.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

38.     Fendi has no adequate remedy at law, and if Defendants' actions are not enjoined, Fendi will continue to suffer irreparable harm to its reputation and the goodwill of its well-known Fendi Trademarks.

**39.**     The injuries and damages sustained by Fendi have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Fendi Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

40.     Fendi hereby re-alleges and incorporates by reference the allegations set forth in

the preceding paragraphs.

41.     Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Fendi Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Fendi or the origin, sponsorship, or approval of Defendants' Counterfeit Fendi Products by Fendi.

42.     By using the Fendi Trademarks on the Counterfeit Fendi Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Fendi Products.

43.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Fendi Products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

44.     Fendi has no adequate remedy at law and, if Defendants' actions are not enjoined, Fendi will continue to suffer irreparable harm to its reputation and the goodwill of its Fendi brand.

## PRAYER FOR RELIEF

WHEREFORE, Fendi prays for judgment against Defendants as follows:

1)  That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

    a.  using the Fendi Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Fendi Product or is not authorized by Fendi to be sold in connection with the Fendi Trademarks;

    b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine

Fendi Product or any other product produced by Fendi, that is not Fendi's or not produced under the authorization, control, or supervision of Fendi and approved by Fendi for sale under the Fendi Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Fendi Products are those sold under the authorization, control, or supervision of Fendi, or are sponsored by, approved by, or otherwise connected with Fendi;

d. further infringing the Fendi Trademarks and damaging Fendi's goodwill;

e. otherwise competing unfairly with Plaintiff in any matter;

f. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Fendi, nor authorized by Fendi to be sold or offered for sale, and which bear any of Fendi's trademarks, including the Fendi Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the online marketplace accounts, Defendant Internet Stores, or any other online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit Fendi Products; and

h. operating and/or hosting websites at the Defendant Internet Stores and any online marketplace accounts registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the Fendi Trademarks or any reproduction, counterfeit copy, or colorable imitation thereof that is not a genuine Fendi Product or not authorized by Plaintiff to be sold in

connection with the Fender Trademarks.

2) Entry of an Order that, upon Fendi's request, those with notice of the injunction, including, without limitation, any online marketplace platforms (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Fendi Trademarks;

3) That Defendants account for and pay to Fendi all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Fendi Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Fendi be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Fendi Trademarks;

5) That Fendi be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.


DATED: February 1, 2024                          Respectfully submitted,

                                                 */s/ Keith A. Vogt*
                                                 Keith A. Vogt (Bar No. 6207971)
                                                 Keith Vogt, Ltd.
                                                 33 West Jackson Boulevard, #2W
                                                 Chicago, Illinois 60604
                                                 Telephone: 312-971-6752
                                                 E-mail: keith@vogtip.com

                                                 **ATTORNEY FOR PLAINTIFF**